[Cite as *State ex rel. Richardson v. Indus. Comm.*, 2025-Ohio-4807.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Regina Richardson, | : | |
| Relator, | : | No. 24AP-301 |
| v. | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio et al., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on October 21, 2025

**On brief:** *Larrimer and Larrimer*, and *Thomas L. Reitz*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Daniel G. Schumick*, for respondent Industrial Commission of Ohio.

IN MANDAMUS

EDELSTEIN, J.

{¶ 1} Relator, Regina Richardson, brought this original action seeking a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its January 13, 2024 order that denied her request for permanent total disability ("PTD") compensation and issue an order granting her request.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate. The magistrate considered the action on its merits and issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate concluded that the commission abused its discretion by failing to consider the limitations contained in the psychological report of Dr. Donald S. Scott, as required by Adm.Code 4121-3-34(D)(3)(i). And, because of this failure, the magistrate additionally concluded the commission's order neither reflects consideration of any

psychological factors as part of the analysis of nonmedical factors under Adm.Code 4121-3-34(D)(2)(b) nor states how the nonmedical disability factors "interact with the medical impairment resulting from the allowed condition(s) in the claim(s)." (Appended Mag.'s Decision at 23, quoting Adm.Code 4121-3-34(D)(3)(h).) Accordingly, the magistrate recommended that this court issue a limited writ of mandamus vacating the commission's order that denied relator's application for PTD compensation and return this matter to the commission to enter an order that is consistent with the law and this decision.

{¶ 3} No objections to the magistrate's decision have been filed.

{¶ 4} "If no timely objections are filed, the court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision." Civ.R. 53(D)(4)(c). Our review of the magistrate's decision reveals no error of law or other facial defect that would preclude adopting it. *See, e.g., State ex rel. Wyse v. Ohio Pub. Emp. Retirement Sys.*, 2024-Ohio-314, ¶ 2 (10th Dist.), citing *State ex rel. Alleyne v. Indus. Comm.*, 2004-Ohio-4223 (10th Dist.) (adopting the magistrate's decision where no objections were filed).

{¶ 5} Accordingly, we adopt the decision of the magistrate as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we grant relator's request for a writ of mandamus, vacate the commission's January 13, 2024 order, and return this matter to this commission to issue a new order in accordance with the law and this decision.

*Writ of mandamus granted.*

MENTEL and BOGGS, JJ., concur.

————————

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Regina Richardson, | : | |
| Relator, | : | |
| v. | | No. 24AP-301 |
| | : | |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |
| | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on June 30, 2025

*Larrimer and Larrimer,* and *Thomas L. Reitz*, for relator.

*Dave Yost,* Attorney General, and *David M. Canale,* for respondent.

IN MANDAMUS

{¶ 6} In 2023, relator Regina Richardson requested permanent total disability compensation in her workers' compensation claim. Respondent Industrial Commission of Ohio ("commission") denied Richardson's request, finding she was capable of sustained remunerative employment at a sedentary level based on medical and nonmedical factors. Richardson now requests a writ of mandamus ordering the commission to vacate its denial of her request and to issue an order granting her permanent total disability compensation. For the following reasons, the magistrate recommends that this court issue a limited writ returning this matter to the commission for further proceedings.

**I. Findings of Fact**

{¶ 7}    1. While employed as a supervisor for respondent Teleperformance USA, Richardson suffered a compensable workplace injury on August 21, 2006.[1] On that date, Richardson was walking into a breakroom when she slipped on water and fell.

{¶ 8}    2. Richardson last worked in December 2008.

{¶ 9}    3. Richardson's workers' compensation claim was ultimately allowed for the following conditions: sprain left knee and leg, left knee contusion, aggravation of preexisting left knee osteoarthritis, right knee osteoarthritis, major depressive disorder, mechanical loosening of prosthetic joint left knee, instability left knee prosthesis, nonpressure chronic ulcer of left ankle limited to breakdown of skin.

{¶ 10}    4. Over the course of the claim, Richardson underwent multiple surgical procedures. In 2009, Richardson underwent a left knee arthroplasty with debridement. Richardson had a total knee arthroplasty on her left knee in 2010 and her right knee in 2011. In 2018, she underwent revision of her left knee total arthroplasty. Richardson also developed an ulcer of the left lateral malleolar region of the ankle with skin breakdown that required multiple surgical procedures involving debridement and skin grafting.

{¶ 11}    5. Richardson filed an application for compensation for permanent total disability (also known as an "IC-2" form) dated May 18, 2023. In the application, Richardson stated that she had previously worked for "25 [years] as [an] RN (BSN), worked as [a] social worker (MSW) with elderly." (Stip. at 4.) Richardson's application for permanent total disability compensation was supported by the reports of D. Richard Bromberg, Ph.D., and Rohn T. Kennington, M.D.

{¶ 12}    6. Dr. Bromberg examined Richardson on April 18, 2022 with regard to her allowed psychological condition. In a report dated May 24, 2022, Dr. Bromberg found Richardson had a whole person impairment of 25 percent due to the allowed psychological condition alone. In a May 12, 2023 addendum to the May 24, 2022 report, Dr. Bromberg found that Richardson's "above-state impairment" resulting from her allowed psychological condition "permanently renders her disabled and unable to engage in sustained remunerative employment." (Stip. at 18.)

{¶ 13}    7. Dr. Kennington examined Richardson on April 25, 2022 for purposes of evaluating permanent total disability. Dr. Kennington found Richardson had "significant,

[1] Respondent Teleperformance USA, also listed in Richardson's complaint as "TPUSA Inc. dba Teleperformance, USA," did not participate in this action.

residual, painful signs and symptoms referable to her industrial injury . . . and the allowed conditions." (Stip. at 9.) Richardson, according to Dr. Kennington, was unable to sit or stand for periods of time more than a few minutes. She also could not climb, crawl, kneel, or squat. Richardson was "render[ed] unable to perform productive labor for a full work schedule" because of "frequent visits with her medical providers." *Id.* Noting that Richardson was "essentially wheelchair-bound," Dr. Kennington found that "based solely on the allowed conditions in the claim, and the significantly debilitating nature of these conditions," Richardson was unable to perform any sustained remunerative employment. *Id.*

{¶ 14} 8. In an order issued on November 9, 2022, a commission district hearing officer granted a request filed by Richardson for vocational rehabilitation services. The district hearing officer found Richardson to be eligible for vocational rehabilitation services and that such services were feasible.

{¶ 15} 9. Jeffrey R. Berman, a vocational rehabilitation case manager, found in a vocational rehabilitation initial assessment report that Richardson was not a good candidate for participation in a vocational rehabilitation plan with a goal of returning to work. As noted by Berman, Richardson reported a standing or walking tolerance of only 10 minutes and was unable to tolerate sitting for more than 15 to 20 minutes before becoming uncomfortable. Barriers to employment included limited computer skills, sedentary restrictions, and no ability for Richardson to provide her own transportation. Berman recommended consulting with Richardson's managed care organization for closure of the vocational rehabilitation file.

{¶ 16} 10. Berman completed a vocational rehabilitation closure report dated January 3, 2023. Berman noted that Richardson reported moderate to high levels of pain daily and had "limited mobility and often requires the use of a cane or wheelchair." (Stip. at 40.) Though Berman noted that Richardson had an advanced degree in nursing and social work, each of Richardson's licenses were expired and her skills were described as "outdated." *Id.* Richardson "reported not having computer skills and would not have the stamina to consider refreshing her skills or being retrained." *Id.* Based on Richardson's "reliance on someone for self-care and assisting with most mobility tasks," Berman found it was "unreasonable to believe Ms. Richardson could obtain and sustain employment." (Stip. at 40.) As a result, Berman, the managed care organization, and the Bureau of

Workers' Compensation ("bureau") agreed it was not feasible for Richardson to participate in a vocational rehabilitation plan with a goal of returning to work.

{¶ 17} 11. A peer review of the closure of Richardson's vocational rehabilitation file was conducted by LaDonna Worthington. In a report dated January 12, 2023, Worthington found the vocational rehabilitation file was closed appropriately as Richardson had little to no rehabilitation potential at that time and there was minimal likelihood of a successful return to work.

{¶ 18} 12. A district hearing officer issued an order on March 4, 2023 affirming a request to close Richardson's vocational rehabilitation file based on the reports of Berman and Worthington. The district hearing officer found Richardson was no longer feasible for vocational rehabilitation services.

{¶ 19} 13. A commission staff hearing officer affirmed the March 4, 2023 order on April 14, 2023.

{¶ 20} 14. For purposes of evaluating the request for permanent total disability compensation, the commission referred Richardson for examinations conducted by independent specialists Andrew Freeman, M.D., and Donald S. Scott, Ph.D.

{¶ 21} 15. On September 13, 2023, Dr. Freeman examined Richardson with regard to the physical conditions allowed in the claim. Based on the results of the examination and a review of Richardson's records, Dr. Freeman completed a commission musculoskeletal specialist report and a physical strength rating form. Dr. Freeman summarized the history of the present condition and Richardson's statements regarding her condition. Dr. Freeman noted that Richardson had nonradiating bilateral knee pain and mild discomfort over the medial left ankle at the site of ongoing drainage.

{¶ 22} As discussed in the report, Richardson reported that her symptoms were improved with rest and medication and made worse by standing and walking. Richardson reported that she required no assistance feeding herself. Richardson did report requiring assistance with getting dressed and getting into the shower and bath. She sometimes required assistance getting out of bed. Richardson stated that she did not drive and did not perform any house cleaning or yard work. Richardson reported using a wheelchair when outside the home and a walker or cane to navigate in her home. Richardson stated that she had "difficulty typing because her 'hands are not working.' " (Stip. at 120.) When she was questioned regarding "the reason for the hands 'not working,' [Richardson] stated she did

not know and then became tearful." *Id.* In reporting past medical history, Dr. Freeman noted the report of "an unknown type of neuromuscular disorder." *Id.* at 121. Dr. Freeman stated that Richardson was "not sure if her neuromuscular disorder affected her hands or not," but "did believe that this condition affects her lower extremities." *Id.*

{¶ 23} Dr. Freeman reported the results of the examination and responded to three questions provided by the commission. First, based on a finding that the allowed physical conditions in the claim were "well stabilized at a treatment plateau and unlikely to improve substantially in terms of symptoms or level of function, with or without treatment," Dr. Freeman opined that Richardson had reached maximum medical improvement. (Stip. at 123.)

{¶ 24} Second, Dr. Freeman also provided the estimated percentage of whole person impairment arising from each allowed condition and a combined whole person impairment. For the condition of nonpressure chronic ulcer of left ankle limited to breakdown of skin, Dr. Freeman found a whole person impairment of 12 percent. For the other remaining conditions, Dr. Freeman assigned a 30 percent whole person impairment each to the right and left knee replacements. Dr. Freeman found Richardson had a combined whole person impairment of 57 percent.

{¶ 25} Third, Richardson's physical limitations and residual functional capacity were described by Dr. Freeman as follows:

> The summary of the <u>objective</u> findings from my examination and the records review include decreased movement associated with reported pain in the knee joints and the draining wound on the left medial ankle. The observed sitting time during my examination was 45 minutes, and this was slightly more than the reported ability to sit.
>
> [Richardson's] activities at the last job, which ended in 2008, included the ability to use a computer, which is more than the current reported activity levels, and there is no plausible medical explanation for this decrease in computer / keyboarding activities related to any of the allowed conditions in the claim. It is possible the ill-defined neuromuscular disorder (outside this claim being reviewed) could affect her ability to use a computer.
>
> Based only on the allowed physical conditions evaluated in this report and not considering the worker's age, education, and work history, the worker's physical limitations are outlined in the PHYSICAL STRENGTH RATING FORM attached to the end of this report.

> Regina Richardson is capable of DOL sedentary category work. These additional restrictions will still allow work in this DOL category. These restrictions from unrestricted work are necessary due to the allowed knee joint conditions in the claims addressed in this report.

(Emphasis in original.) (Stip. at 125.) On the physical strength rating form attached to the report, Dr. Freeman indicated Richardson was capable of sedentary work. Dr. Freeman's sedentary work designation included the following limitation: "[Richardson] is capable of sedentary work except that she should not be required to stand or walk on the job. These limitations will still allow sedentary work. This level of work limitation is consistent with [Richardson's] self-reported levels of current and previous activities." (Stip. at 126.)

{¶ 26} 16. On September 14, 2023, Dr. Scott examined Richardson regarding the allowed psychological condition. Based on the examination and a review of the records, Dr. Scott completed a commission mental and behavioral health specialist report. In an introductory note to the report, Dr. Scott stated the following:

> This was a complex interview that lasted about 100 minutes. I have included this initial note because it is my belief that [Richardson's] nonwork related probable dementia had an overwhelming impact on the present interview and colored her response. I first evaluated [Richardson] in May 2018 and concluded in my [bureau] [extent of disability] examination that [Richardson] reached [maximum medical improvement] for the allowed condition of major depressive disorder. I also concluded that [Richardson] showed signs of dementia, had a history of psychosis and had significant limitations from what she stated was a diagnosis of fibromyalgia.

> In the present interview, [Richardson] appeared even more limited by what appeared to be dementia.

(Stip. at 177.) Dr. Scott summarized Richardson's reported medical complaints, which included "high levels of pain from fibromyalgia, back pain and 'sciatica,' which she rated as higher than her work-related pain." *Id*. at 178. Additionally, Richardson "complained of her memory: 'I get embarrassed, like I should know things.' " *Id*.

{¶ 27} Dr. Scott provided an opinion regarding Richardson's condition through a narrative summary. In the summary, Dr. Scott noted findings from a prior interview with Richardson. Additionally, Dr. Scott stated that Richardson "was showing memory problems and her son confirmed that [Richardson] had memory problems for the last two years." (Stip. at 186.) Dr. Scott stated that Richardson "ha[d] been one of the most difficult

injured workers to evaluate." *Id.* Though it was "absolutely clear" that Richardson had reached a treatment plateau, Dr Scott found the "difficult part" to be "parsing out the impact of [Richardson's] allowed psychological condition from the vastly more prominent nonwork related conditions." *Id.* With regard to these nonallowed conditions, Dr. Scott stated: "Based on [Richardson's] statement, she feels more pain from her 'sciatica,' back pain and fibromyalgia than she does from her work-related injury. Based on this it is reasonable to assume that she has more physical limitations from her nonwork related conditions than from her work-related conditions." *Id.* Dr. Scott found "[a]nother highly significant nonwork related condition" to be "dementia," and provided a number of observations in support of this opinion. In part, Dr. Scott stated:

> [Richardson] has a master's degree in social work and was asked all the time to rate her level of experienced pain. But she could not transfer this skill to rating her level of depression. Indeed, she could not even grasp the concept. This demonstrates an enormous loss of cognitive acuity. Indeed, in 2018, in my previous evaluation, [Richardson] was able to rate her depression on a 0-10 scale and reported her average level of depression was 9/10.

(Stip. at 186.) After describing a number of other observations, Dr. Scott stated that "[n]one of the data I describe above could possibly be related to the allowed psychological condition of major depressive disorder." *Id.* at 187. "Based on these data," Dr. Scott stated, "I have done my best to separate out the impact of the allowed psychological condition from the nonwork related conditions." *Id.*

{¶ 28} Following the narrative summary, Dr. Scott responded to questions posed by the commission. The first question asked whether Richardson had reached maximum medical improvement with regard to the allowed psychological condition. Dr. Scott responded in the affirmative, stating: "Yes. This is based on the criteria of an absence of any significant change in symptoms, in treatment, in medications and function. [Richardson's] psychological symptoms of major depressive disorder appear quite stable. . . . It is very difficult to assess accurately [Richardson's] level of function, but they appear low and somewhat reduced in function compared to 2018." (Stip. at 187.) Next, the second question asked the specialist to provide the class and percentage of whole person impairment due to the allowed psychological condition in each of the four functional areas and the overall percentage of whole person impairment. With regard to each of the four functional areas,

Dr. Scott found a mild, 10 percent whole person impairment. This resulted in an overall whole person impairment of 10 percent.

{¶ 29} The third question asked the specialist to summarize the residual functional capacity resulting from the impairment associated with the allowed condition. Dr. Scott responded:

> Responding to this question is equivalent to asking what is the impact of a few drops of blue dye in a five gallon bucket of water? However, I will give my best estimate.
>
> Taking into account only the impact of [Richardson's] work related major depressive disorder, I believe [Richardson] would be able to work in a slow paced but nevertheless competitive work environment. She would be able to interact with others. She would be able to recall and execute simple repetitive tasks and would be able to adequately regulate her emotional behavior.

(Stip. at 188.) In an attached occupational activity assessment from mental and behavioral examination ("occupational activity assessment") form, Dr. Scott indicated that Richardson had no work limitations. Under the section applying in instances where the specialist had found the injured worker was capable of work with limitation or modification, Dr. Scott referred to the response to the residual functional capacity question in the report. (Stip. at 189.)

{¶ 30} 17. A statement of facts in the record contains a summary of Richardson's past medical history. The listed history indicated the presence of several nonallowed conditions referenced in other reports, including "fibromyalgia" and "neuromuscular disorder." (Stip. at 192.)

{¶ 31} 18. A staff hearing officer conducted a hearing on Richardson's application for permanent total disability compensation on January 9, 2024. By order issued January 13, 2024, the staff hearing officer denied Richardson's application. The staff hearing officer summarized some of the history of the claim, surgeries related to allowed conditions, and parts of the reports of Dr. Freeman and Dr. Scott.

{¶ 32} Based on the reports of Dr. Freeman and Dr. Scott, the staff hearing officer found Richardson had reached maximum medical improvement for all the allowed conditions in the claim. The staff hearing officer found Richardson "retain[ed] the residual functional capacity to perform sedentary work with the exception that she should not be required to stand or walk when considering the allowed physical medical conditions in this

claim." (Stip. at 195.) The staff hearing officer further found Richardson was "able to work in a competitive work environment with no limitations as a result of the allowed psychological medical condition in this claim." *Id.* Having found Richardson was capable of engaging in sustained remunerative employment in a sedentary work capacity, the staff hearing officer next considered the nonmedical disability factors.

{¶ 33} The staff hearing officer recounted Richardson's testimony at the hearing. As set forth in the order,[2] Richardson testified that she had a "Bachelor of Science degree in Nursing, obtained a Master's degree in Social Work, completed approximately half of the course work towards a Doctorate's degree in Ministry, and can read, write and engage in basic math without difficulty." (Stip. at 195.) Richardson also testified that "her work experience consisted of working as a nurse in a hospital, nursing home or home health setting for 25 to 30 years, working as a social worker at a geriatric home care facility for approximately two years, and most recently working as a telemarketer supervisor for approximately three years." *Id.*

{¶ 34} The staff hearing officer found Richardson's age of 69 years at the time of the hearing to be a negative vocational factor "when competing with other workers in an attempt to re-enter the workforce." (Stip. at 195.) Richardson's educational level, on the other hand was found to be a positive vocational factor. The staff hearing officer found Richardson's "past educational level" to be a "significantly positive factor for employment," "an asset for a return to work within her physical medical restrictions," and "an asset in returning to the workforce in a sedentary position of employment." *Id.* at 196. Richardson's prior work experience was also found to be a positive vocational factor. The staff hearing officer found Richardson was a "dependable and steady worker as she was able to work continually for over 30 years." *Id.* After summarizing some of Richardson's duties in her prior work experience, the staff hearing officer found Richardson had "shown a variety of skills," including her ability to "supervise others at work," "create care plans," "do record-keeping," and make "use of a computer." *Id.* The staff hearing officer found these skills would be "transferable to entry level or higher sedentary work employment activity within her physical medical restrictions as noted above." *Id.* Additionally, the staff hearing officer found Richardson's prior employment "would allow [her] to be employed in a semi-skilled

---

[2] No transcript of this hearing appears in the record.

position of employment and certainly at least in an unskilled position of employment in the future." *Id.*

{¶ 35} Based on the examination of the nonmedical factors, the staff hearing officer found that "despite [Richardson's] age, [her] significant educational achievements and past work history with transferable skills are sufficient in order for [her] to engage in entry level or higher sedentary work employment activity within her physical medical restrictions as noted above." (Stip. at 196.) Based on all the findings, "including the medical reports by Dr. Freeman and Dr. Scott, and considering [Richardson's] age, education, and work experience," the staff hearing officer found Richardson "would be able to engage in sustained remunerative employment activity and is therefore not permanently and totally disabled." *Id.*

{¶ 36} 19. Richardson filed a request for reconsideration from the January 13, 2024 staff hearing officer's order. On February 17, 2024, the commission issued an order denying Richardson's request for reconsideration.

{¶ 37} 20. Richardson commenced this action with the filing of her complaint for writ of mandamus on May 13, 2024.

## II. Discussion and Conclusions of Law

{¶ 38} Richardson requests the issuance of a writ of mandamus ordering the commission to vacate its denial of her request for permanent total disability compensation and to issue a new order finding she is entitled to such compensation.

## A. Requirements for Mandamus

{¶ 39} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, Richardson must establish a clear legal right to the requested relief, that the commission has a clear legal duty to provide such relief, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). "A writ of mandamus may lie when there is a legal basis to compel the commission to perform its duties under the law or when the commission has abused its discretion in carrying out its duties." *State ex rel. Cassens Corp. v. Indus. Comm. of Ohio*, 2024-Ohio-526, ¶ 10. With regard to legal questions, a writ of mandamus " 'may issue against the Industrial Commission if the commission has incorrectly interpreted Ohio law.' " *Id.*, quoting *State ex rel. Gassmann v. Indus. Comm.*, 41 Ohio St.2d 64, 65 (1975).

{¶ 40} With regard to factual determinations, where there is no evidence upon which the commission could have based its factual determination, the commission has abused its discretion and the issuance of a writ of mandamus is appropriate. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165, 167 (1981). *See State ex rel. Johnson v. Indus. Comm.*, 11 Ohio App.3d 22, 23 (10th Dist. 1983) ("For more than fifty years, the 'some-evidence' rule, although not always referred to by that name, has been recognized as the rule to be applied in determining whether there has been an abuse of discretion with respect to factual matters."). "The commission is the exclusive finder of fact and has the sole responsibility to evaluate the weight and credibility of the evidence." *See State ex rel. Kidd v. Indus. Comm.*, 2023-Ohio-2975, ¶ 17.

{¶ 41} Furthermore, in all matters affecting the rights and obligations of the claimant or employer, the commission must specifically state what evidence has been relied upon and briefly explain the reasoning for its decision. *See State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991), at syllabus; *State ex rel. Yellow Freight Sys. v. Indus. Comm.*, 71 Ohio St.3d 139, 142 (1994). "Where the commission fails to comply with *Noll*, the commission has abused its discretion." *State ex rel. Prinkey v. Emerine's Towing, Inc.*, 2024-Ohio-1137, ¶ 12 (10th Dist.). On the other hand, "[w]here a commission order is adequately explained and based on some evidence, even evidence that may be persuasively contradicted by other evidence of record, the order will not be disturbed as manifesting an abuse of discretion." *State ex rel. Mobley v. Indus. Comm. of Ohio*, 78 Ohio St.3d 579, 584 (1997).

## B. Permanent Total Disability

{¶ 42} "[T]he purpose of permanent and total disability benefits is to compensate injured persons for impairment of earning capacity." *State ex rel. Stephenson v. Indus. Comm.*, 31 Ohio St.3d 167, 170 (1987), citing *State ex rel. Gen. Motors Corp. v. Indus. Comm.*, 42 Ohio St.2d 278 (1975). Permanent total disability is the inability to do any sustained remunerative employment due to the allowed conditions in the claim. *See State ex rel. Schultz v. Indus. Comm.*, 2002-Ohio-3316, ¶ 61, citing *Stephenson* at 170; Adm.Code 4121-3-34(B)(1). Compensation for permanent total disability is governed by R.C. 4123.58, which allows compensation only when one of the following conditions is met:

> (1) The claimant has lost, or lost the use of both hands or both arms, or both feet or both legs, or both eyes, or of any two

thereof; however, the loss or loss of use of one limb does not constitute the loss or loss of use of two body parts;

(2) The impairment resulting from the employee's injury or occupational disease prevents the employee from engaging in sustained remunerative employment utilizing the employment skills that the employee has or may reasonably be expected to develop.

R.C. 4123.58(C). Work is considered "sustained" under R.C. 4123.58(C) when it "consists of an ongoing pattern of activity." *State ex rel. Bonnlander v. Hamon*, 2017-Ohio-4003, ¶ 15. To be considered sustained, the work need not be regular or daily; rather, it may be intermittent, occasional, or even part-time. *Id.*

{¶ 43} Circumstances prohibiting compensation for permanent total disability are contained in R.C. 4123.58(D), which provides as follows:

Permanent total disability shall not be compensated when the reason the employee is unable to engage in sustained remunerative employment is due to any of the following reasons, whether individually or in combination:

(1) Impairments of the employee that are not the result of an allowed injury or occupational disease;

(2) Solely the employee's age or aging;

(3) The employee retired or otherwise is not working for reasons unrelated to the allowed injury or occupational disease.

(4) The employee has not engaged in educational or rehabilitative efforts to enhance the employee's employability, unless such efforts are determined to be in vain.

R.C. 4123.58(D).

{¶ 44} Adm.Code 4121-3-34 contains definitions, requirements, and procedures for the adjudication of applications for permanent total disability compensation. Definitions pertaining to the classification of physical demands of positions of employment are found in Adm.Code 4121-3-34(B)(2). Within this context, "sedentary work" is defined as follows:

"Sedentary work" means exerting up to ten pounds of force occasionally (occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing

are required only occasionally and all other sedentary criteria are met.

Adm.Code 4121-3-34(B)(2)(a).

{¶ 45} If the commission finds the claimant is medically incapable of returning to the former position of employment, but may be able to engage in sustained remunerative employment, commission must also consider nonmedical disability factors. Adm.Code 4121-3-34(D)(2)(b). Nonmedical factors include: "the injured worker's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the injured worker may return to the job market by using past employment skills or those skills which may be reasonably developed." *Id. See Stephenson*, 31 Ohio St.3d at 173 (setting forth the nonmedical disability factors, which are commonly referred to as "*Stephenson* factors"). Thus, even where the injured worker is medically capable of employment, permanent total disability compensation may still be awarded based on the nonmedical disability factors. *See Kidd*, 2023-Ohio-2975, at ¶ 20.

{¶ 46} Where a claim contains an allowed psychiatric or psychological condition and the injured worker retains the physical ability to engage in some sustained remunerative employment, the commission "shall consider whether the allowed psychiatric condition(s) in combination with the allowed physical condition(s) prevents the injured worker from engaging in sustained remunerative employment." Adm.Code 4121-3-34(D)(3)(i). *See State ex rel. Urban v. Wano Expiditing Inc.*, 2024-Ohio-2461, ¶ 27 (10th Dist.); *State ex rel. Guy v. Indus. Comm.*, 2009-Ohio-2553, ¶ 27 (10th Dist.).

**C. Analysis**

{¶ 47} Richardson argues the commission abused its discretion by denying her request for permanent total disability compensation for several reasons. For purposes of discussion, Richardson's arguments will be considered out of order.

{¶ 48} First, Richardson argues the presence of nonallowed conditions does not prohibit a finding of permanent and total disability. Based on "notations about physical and psychological limitations due to non-allowed conditions" in the reports of Dr. Freeman and Dr. Scott, which were relied upon by the commission, Richardson states she was led "to suspect that both doctors' opinions were influenced by these non-allowed conditions." (Richardson's Brief at 16.) Pointing to statements regarding nonallowed conditions,

Richardson argues that both Dr. Freeman and Dr. Scott's reports are "fatally flawed" and, therefore, unable to serve as some evidence supporting the commission's decision. *Id.* at 17.

**{¶ 49}** It is well established that a claimant cannot receive temporary total disability compensation "for disability caused by conditions unrelated to [the] employment injury or resulting from nonallowed medical conditions." *State ex rel. Bradley v. Indus. Comm.*, 77 Ohio St.3d 239, 242 (1997), citing *State ex rel. Waddle v. Indus. Comm.*, 67 Ohio St.3d 452, 454-55 (1993). *See State ex rel. Jackson Tube Servs. v. Indus. Comm.*, 2003-Ohio-2259, ¶ 29 (reaffirming that temporary total disability "can never be based--even in part--on nonallowed conditions"). Though "[t]he mere presence of a nonallowed condition in a claim for [temporary total disability compensation] does not in itself destroy the compensability of the claim," the claimant in such a case "must meet [their] burden of showing that an allowed condition independently caused the disability." *Bradley* at 242.

**{¶ 50}** Though Dr. Freeman and Dr. Scott refer to symptoms or conditions not allowed in the claim, they were clear in each of their reports that their conclusions were based solely on the allowed conditions in the claim. At least in part, the statements in the reports related to nonallowed conditions were offered to explain statements made by Richardson or the results of Richardson's examinations. For example, Dr. Freeman noted Richardson's statement that she had "difficulty typing because her 'hands are not working.' " (Stip. at 120.) With regard to past medical history, Dr. Freeman recorded that Richardson "stated that she has a history of . . . an unknown type of neuromuscular disorder." (Stip. at 121.) Dr. Freeman then stated that Richardson was "not sure if her neuromuscular disorder affected her hands or not," but "did believe that this condition affects her lower extremities." *Id.* Dr. Freeman also stated that Richardson was "able to bend for up to a minute, but this is limited by her chronic low back pain that is **outside the allowed conditions in this claim**." (Emphasis added.) *Id.* at 120. Dr. Freeman also stated that Richardson did not "perform any twisting for the same reason." *Id.*

**{¶ 51}** Although references to nonallowed conditions are present in Dr. Freeman's responses to questions posed by the commission, Dr. Freeman is clear that the opinions offered in response to the questions are based solely on the physical medical conditions allowed in the claim. Based on a finding that "[a]ll the **allowed conditions** are well stabilized at a treatment plateau and unlikely to improve substantially in terms of symptoms or level of function, with or without treatment," Dr. Freeman opined that

Richardson had reached maximum medical improvement for the allowed conditions in the claim. (Emphasis added.) (Stip. at 123.) Following impairment ratings based only on the allowed conditions, Dr. Freeman opined:

> [Richardson's] activities at the last job, which ended in 2008, included the ability to use a computer, which is more than the current reported activity levels, and there is no plausible medical explanation for this decrease in computer / keyboarding activities related to **any of the allowed conditions in the claim**. It is possible the ill-defined neuromuscular disorder (**outside this claim being reviewed**) could affect her ability to use a computer.

(Emphasis added.) *Id.* at 125. Furthermore, Dr. Freeman stated that the assessment of Richardson's physical limitations in the physical strength rating form was "[b]ased only on the allowed physical conditions evaluated in this report and not considering the worker's age, education, and work history." *Id.* Thus, Dr. Freeman made clear that, while nonallowed conditions could impact Richardson's abilities, they were not considered for purposes of providing an opinion on Richardson's claim. As a result, it was not an abuse of discretion for the commission to rely on Dr. Freeman's report.

{¶ 52} Similarly, Dr. Scott's report contains some mention of nonallowed conditions, but the opinions expressed in the report are clearly indicated to be based solely on the allowed psychological condition. In particular, Richardson points to Dr. Scott's statements regarding symptoms attributed to "what appeared to be dementia." (Stip. at 177.) Dr. Scott stated that in a prior examination, Richardson "showed signs of dementia, had a history of psychosis and had significant limitations from what she stated was a diagnosis of fibromyalgia." *Id.* Dr. Scott explained the inclusion of this discussion by stating that Richardson's "**nonwork related** probable dementia had an overwhelming impact on the present interview and colored her response." (Emphasis added.) *Id.* Dr. Scott's statements reflect a recognition that the discussion of dementia was not related to an allowed condition in the claim. Further, in explaining "highly significant" nonwork related conditions that were present in the results of the examination, Dr. Scott stated, "I have done my best to separate out the impact of the allowed psychological condition from the nonwork related conditions." *Id.* at 187. Finally, Dr. Scott stated that the opinion regarding Richardson's residual functional capacity was made "[t]aking into account only the impact of [Richardson's] work related major depressive disorder." *Id.* at 188. Thus, it was not an

abuse of discretion for the commission to rely on Dr. Scott's report as the opinions expressed were based solely on the allowed conditions in the claim.

{¶ 53} Second, Richardson argues the commission abused its discretion by failing to adequately explain how Richardson was "physically capable of working at a sedentary employment" level. (Richardson's Brief at 13.) Richardson argues that the commission failed to "explain how someone who must leave the house in a wheelchair, and who does not drive, is going to attend a job that does not require her to stand or walk." *Id.* at 15. Richardson also argues that the commission failed to explain "how Richardson is supposed to transport herself to the restroom or to get a drink of water unless someone pushes her in a wheelchair." *Id.*

{¶ 54} Dr. Freeman, in the musculoskeletal specialist report to the commission, noted Richardson's statement that "[w]alking more than a few steps causes [Richardson] to need to use a cane or a walker at home." (Stip. at 119.) Richardson reported to Dr. Freeman that she "usually never leaves the house without a wheelchair." *Id.* Richardson also stated that "[o]ften her son accompanies her and pushes her wheelchair." *Id.*

{¶ 55} Dr. Freeman opined that Richardson was capable of sedentary work, both in the report to the commission and on the physical strength rating form attached to the report. The physical strength rating form contained the definition of "sedentary work," as provided under Adm.Code 4121-3-34(B)(2)(a). In indicating that Richardson was capable of sedentary work under this definition, Dr. Freeman included the following limitation: "[Richardson] is capable of sedentary work except that she should not be required to stand or walk on the job. These limitations **will still allow sedentary work**. This level of work limitation is consistent with [Richardson's] self-reported levels of current and previous activities." (Emphasis added.) (Stip. at 126.)

{¶ 56} The staff hearing officer noted the findings in Dr. Freeman's report, specifically noting that "[a]t the exam, [Richardson] reported constant pain in her left and right knee and left ankle, with limited mobility without the assistance of a cane, walker, or wheelchair." (Stip. at 194-95.) The staff hearing officer relied on Dr. Freeman's report and found that Richardson "retains the residual functional capacity to perform sedentary work with the exception that she should not be required to stand or walk when considering the allowed physical medical conditions in this claim." *Id.* at 195.

{¶ 57} Initially, it is noted that the notes in Dr. Freeman's report regarding Richardson's self-reported description of her abilities are markedly different in certain respects from the statements describing Richardson's abilities in her brief. Next, with regard to Richardson's argument, Dr. Freeman's report and the attached physical strength rating form completed by Dr. Freeman constitute some evidence upon which the commission could find that Richardson was capable of some sustained remunerative employment based on the physical conditions allowed in the claim. The staff hearing officer specifically relied on this evidence in reaching the conclusion that Richardson was capable of sustained remunerative employment at a sedentary level. By specifying the evidence relied upon and providing a brief explanation for the determination, the commission's analysis of whether Richardson was capable of sustained remunerative employment based on the allowed physical conditions met the minimum requirements of *Noll*. Richardson provides no authority for requiring more.

{¶ 58} Third, Richardson asserts the commission abused its discretion by failing to cite some evidence supporting the finding that Richardson has no psychological limitations and is able to perform sedentary employment. Specifically, Richardson argues that the commission's "conclusion is not supported by Dr. Scott's opinion due to the inclusion of restrictions." (Emphasis removed.) (Richardson's Brief at 11.)

{¶ 59} In response to the third question posed by the commission, which pertained to Richardson's residual functional capacity as a result of the allowed psychological condition, Dr. Scott stated: "I believe [Richardson] would be able to work in a slow paced but nevertheless competitive work environment. She would be able to interact with others. She would be able to recall and execute simple repetitive tasks and would be able to adequately regulate her emotional behavior." (Stip. at 188.) The occupational activity assessment form that was attached to the report sought the provider's opinion the claimant's work capabilities based solely on impairment resulting from the allowed mental and behavioral condition in the claim and with no consideration of age, education, or work training. The form provided an option for the provider to indicate (1) "This Injured Worker has no work limitations"; (2) "This Injured Worker is incapable of work"; or (3) "This Injured Worker is capable of work with the limitation(s) / modification(s) noted below." *Id.* at 189. Dr. Scott marked the first option on the form, indicating that Richardson had "no work limitations." *Id.* However, in the blank lines below the third option, which pertained

to injured workers who were capable of work with limitations or modifications, there was a handwritten note which stated, "See response to question 3 in report." *Id.*

{¶ 60} The staff hearing officer summarized portions of Dr. Scott's report. In particular, the staff hearing officer noted that Dr. Scott "opined that, based solely on the allowed psychological medical condition in this claim, [Richardson] has no work limitations." (Stip. at 195.) The staff hearing officer also noted that Dr. Scott "opined [Richardson] would be able to work in a slow paced, but nevertheless competitive, work environment, would be able to interact with others, and would be able to recall and execute simple repetitive tasks." *Id.* The staff hearing officer, in concluding that Richardson was medically capable of work, found that Richardson was "able to work in a competitive work environment with no limitations as a result of the allowed psychological medical condition in this claim" *Id.*

{¶ 61} Absent from the staff hearing officer's order is any explanation of the discrepancy in Dr. Scott's occupational activity assessment form. Although Dr. Scott indicated that Richardson had **no** limitations, Dr. Scott also completed a section of the form that only applies when finding that the injured worker **has** limitations or modifications. Moreover, Dr. Scott's handwritten notation in the limitation section points to the answer to the third question posed by the commission in the report, which pertained to Richardson's residual functional capacity. In the limitation section, Dr. Scott included a number of limitations on Richardson's ability to work. Most notable were Dr. Scott's statements that Richardson was capable of working in a "**slow paced** but nevertheless competitive work environment" and could "recall and execute **simple repetitive** tasks." (Emphasis added.) (Stip. at 188.) These statements appear in the form of a limitation, as rapid-paced work or more complex tasks seem to fall outside of the scope of Dr. Scott's statement regarding Richardson's capabilities. Yet, other than mentioning this statement in the summary of Dr. Scott's report, the staff hearing officer does not apply the limitations to analysis of the medical or nonmedical factors. Instead, the staff hearing officer elides these statements by mentioning only Richardson's ability to "work in a competitive work environment with **no limitations** as [a] result of the allowed psychological medical condition in this claim." (Emphasis added.) (Stip. at 195.) Because Dr. Scott's report, which was relied on by the staff hearing officer, contains limitations based on the allowed psychological condition, the staff

hearing officer's statement Richardson had no limitations was not supported by some evidence.

{¶ 62} Additionally, by finding Richardson was capable of work with no limitations based on the allowed psychological conditions, the staff hearing officer failed to comply with Adm.Code 4121-3-34(D)(3)(i). In claims in which a psychiatric condition has been allowed and the claimant retains the physical capacity to engage in some sustained remunerative employment, Adm.Code 4121-3-34(D)(3)(i) requires the commission to consider whether the allowed psychiatric condition in combination with the allowed physical condition prevents the claimant from engaging in sustained remunerative employment. *See Guy*, 2009-Ohio-2553, ¶ 4.

{¶ 63} In *Guy*, the claimant, who had both psychological and physical conditions allowed in the claim, challenged whether the commission complied with Adm.Code 4121-3-34(D)(3)(i) in denying the claimant's application for permanent total disability compensation. The commission, through a staff hearing officer, considered a physician's report that addressed the claimant's physical conditions and a psychologist's report that addressed the claimant's psychological conditions. With regard to each report, the staff hearing officer "noted the restrictions each doctor reported as a result of the allowed conditions." *Guy* at ¶ 5. Based on those reports, the staff hearing officer found that, with regard to the allowed conditions, the claimant " 'retains the residual functional capacity to perform sustained remunerative employment at the sedentary and light work level, physically and some sustained remunerative employment, as limited for [the psychologist's] opinion.' " *Id*. at ¶ 6. The staff hearing officer also considered the nonmedical disability factors " 'in conjunction with the medical restrictions and limitations' " contained in both the physician's and psychologist's reports. *Id*. at ¶ 7. On review, this court found the staff hearing officer "considered the restrictions and limitations that both [the physician] and [psychologist] imposed." *Id*. As a result, this court concluded that "[a]s a whole, the staff hearing officer's decision complies with the administrative provision that requires the allowed psychiatric condition to be considered in combination with the allowed physical condition." *Id*. at ¶ 6.

{¶ 64} In this case, unlike in *Guy*, the staff hearing officer's order reflects a failure to consider the limitations contained in Dr. Scott's report—the psychological report upon which the order was based. By failing to recognize the psychological limitations, the staff

hearing officer did not properly consider Richardson's allowed psychological condition in combination with the allowed physical condition in determining whether these conditions prevented Richardson from engaging in sustained remunerative employment. *See Urban*, 2024-Ohio-2461, at ¶ 47. *See also State ex rel. Metz v. GTC, Inc.*, 2015-Ohio-1348, ¶ 15 (stating that "if the physician has imposed specific restrictions in the body of the report, the commission must consider whether any physical limitations the doctor listed correspond with the worker's ability to perform at the level indicated by the doctor"). As a result, the staff hearing officer failed to comply with Adm.Code 4121-3-34(D)(3)(i).

{¶ 65} Fourth, Richardson argues that the commission failed to comply with *Stephenson* in "assessing [Richardson's] vocational assets." (Richardson's Brief at 17.) In part, Richardson points to the vocational reports produced by Berman and Worthington. Richardson argues that "the barriers to employment regarding both the allowed physical conditions and allowed psychological conditions were found significant enough to find Ms. Richardson not feasible for vocational rehabilitation services." (Emphasis removed.) *Id.* at 18. To the extent that Richardson challenges the staff hearing officer's conclusions regarding the vocational reports, "it is well-settled law that the commission is the expert on non-medical factors, including vocational evidence." *State ex rel. Patterson v. Indus. Comm.*, 2013-Ohio-1016, ¶ 11 (10th Dist.), citing *State ex rel. Jackson v. Indus. Comm.*, 1997-Ohio-152. The commission is not required to rely upon or accept the conclusions in a vocational report. *Patterson* at ¶ 11. Thus, the commission was not required to accept or base its conclusions on the vocational reports in the record. *See id.* (stating that "the commission can reject the conclusion of a rehabilitation report and still draw its own conclusion from the same non-medical information").

{¶ 66} Richardson also argues that the commission failed to consider limitations and opinions in Dr. Scott's report with regard to Richardson's allowed psychological condition in addressing the *Stephenson* factors. Again, the nonmedical *Stephenson* factors include "age, education, work record, and all other factors, such as physical, **psychological**, and sociological, that are contained within the record that might be important to the determination as to whether the injured worker may return to the job market by using past employment skills or those skills which may be reasonably developed." (Emphasis added.) Adm.Code 4121-3-34(D)(2)(b). As discussed above, in *Guy*, this court noted that the staff hearing officer considered the nonmedical disability factors

in conjunction with the medical restrictions and limitations provided by the claimant's physician and psychologist. In this case, the staff hearing officer's order reflects consideration of Richardson's age, education, and work record. However, considering the staff hearing officer's failure to recognize and consider the limitations contained in Dr. Scott's report as required under Adm.Code 4121-3-34(D)(3)(i), the magistrate finds the staff hearing officer's order does not reflect consideration of any psychological factors as part of the analysis of nonmedical factors under Adm.Code 4121-3-34(D)(2)(b). Furthermore, by failing to fully address the allowed psychological condition, including the limitations contained in Dr. Scott's report, the staff hearing officer's order violates the command in Adm.Code 4121-3-34(D)(3)(h) to state how the nonmedical disability factors "interact with the medical impairment resulting from the allowed condition(s) in the claim(s)."

## D. Conclusion

{¶ 67} Accordingly, it is the decision and recommendation of the magistrate that this court should issue a limited writ of mandamus vacating the commission's order that denied Richardson's application for permanent total disability compensation and returning this matter to the commission to enter an order resolving such application consistent with law and this decision. *See Urban*, 2024-Ohio-2461, at ¶ 57.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.